## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:08CR100–HEH |
| | ) | |
| R. GREGORY GIBBS, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION
#### (Denying Claim for Restitution filed by Dwayne Farnsworth)

This is a disputed claim for restitution filed by a purported victim of the defendant's scheme to defraud a host of investors. On March 19, 2008, the defendant, R. Gregory Gibbs, entered a plea of guilty to a single count of mail fraud. As a part of his plea agreement, the defendant agreed, as required by 18 U.S.C. § 3663(A)(a)(3), to make restitution to the victims of his fraud scheme for the full amount of their losses. This restitution provision included not only victims of the offense for which he pled guilty, but also others affected by his fraudulent currency investments. In all, 138 victims have filed claims for restitution, totaling in excess of $14,000,000. Federal agents have recovered approximately $4,250,000 in assets, which are currently in the custody of a court-appointed receiver. Of the 138 victims, only three filed disputed claims. Among those is the immediate claimant, Dwayne Farnsworth ("Farnsworth").

Both Farnsworth and the United States have filed detailed memoranda of law supporting their respective positions. Farnsworth is claiming $565,000 in restitution. On September 23, 2008, a hearing was conducted on Farnsworth's petition. The Court heard

sworn testimony from the defendant, R. Gregory Gibbs ("Gibbs"), the claimant, Dwayne Farnsworth, and two FBI agents assigned to the investigation. For the reasons that follow, the Court concludes that Farnsworth is not entitled to the restitution claimed.

The facts underlying Farnsworth's investment of $565,000 contained in a cardboard box are troubling. Farnsworth, an attorney in the suburbs of Phoenix, Arizona, described his practice as predominantly commercial litigation and bankruptcy. Presently, Farnsworth characterized his practice as consisting of him and a loose affiliation with one other attorney. In prior years, before changes in the bankruptcy law took place, his firm consisted of as many as four lawyers. He testified that he has between 1,000–2,000 bankruptcy clients a year, each paying between $800 and $1,000. Farnsworth stated that many of clients pay his fees in cash. Significantly, Farnsworth also testified that he travels approximately 7,000 miles a year commuting between bankruptcy courts.

When asked about the source of the currency at issue in this case, Farnsworth responded that the $565,000 represented money he had received from clients for mileage reimbursement. According to Farnsworth, between 1993 and 2006, he bundled the cash and stored it in a box in his garage. Later it was transferred to a locked vault or cabinet. He steadfastly maintained that he paid income tax on the cash retainers, but believed that the mileage was deductible from his gross income, presumably as a business expense. Farnsworth produced no tax returns to corroborate his testimony, stating that none were in his possession.

2

Why did Farnsworth accumulate such a horde of cash?  Farnsworth testified that his father and grandfather had recounted to him their financial experiences during the Depression era.  Consequently, he was reluctant to deal with banking institutions. Farnsworth wanted to maintain a sufficient amount of cash on hand to support his law firm in the event of an economic crisis.  Furthermore, Farnsworth admitted that he had earlier told federal agents that his fear of Y2K, and presumably its effect on the banking system, dissuaded him from depositing the currency in a bank.

Sometime in August 2006, Farnsworth learned of the lucrative investment scheme operated by Gibbs.  Farnsworth called Gibbs and inquired about his currency investment program.  Farnsworth specifically asked Gibbs if he would accept cash.  Gibbs initially declined but called back the next day and indicated that cash would be acceptable.  They agreed to meet in West Virginia on August 14.

Farnsworth testified under oath that he rented a vehicle in Arizona, placed a cardboard box containing $565,000 in wrapped bundles in the trunk, and drove to West Virginia.  The idea of traveling by air did not appeal to Farnsworth.  He claimed he was uncomfortable with putting the money in the cargo hold and felt that driving was safer. At the August 14, 2006, meeting with Gibbs, Farnsworth signed a loan agreement investing the currency with Gibbs for a one year period, with accumulated interest at a rate of 5 percent.  Farnsworth also produced an automatic money counting machine to confirm the amount of currency in the box.  In transferring the money to Gibbs,

3

Farnsworth cautioned him to deposit the money incrementally to avoid raising any "red flags."

Gibbs noted on the loan agreement executed between him and Farnsworth that their investment agreement would commence on October 1, 2006. Gibbs testified that he believed it would require several months to deposit the cash in the bank in a manner that would not raise any red flags. In fact, in the weeks that ensued, Gibbs made four deposits of $7,000 or $8,000 spaced approximately one week apart. Thereafter, Gibbs decided it was easier to use the cash to pay contractors doing renovations on his home. In the months that followed, Farnsworth had no further contact with Gibbs, until he received a letter from Gibbs in March 2007 indicating that his investment business was no longer in operation.

By way of further explanation for the investment, Farnsworth testified that he was accumulating the currency for the purpose of funding a charitable organization known as "Value One." He believed that the return on his money promised by Gibbs would allow him to accumulate the $1 million he believed was necessary to make Value One a viable nonprofit organization. Farnsworth adamantly denied that he had suggested to Gibbs that the currency be deposited in a structured fashion to avoid the filing of Currency Transaction Reports, or Form 8300. In fact, Farnsworth testified that prior to this case, he was unaware of the concept of structured deposits, or the requirement for Currency Transaction Reports on deposits exceeding $10,000. Finally, Farnsworth testified that

4

under his loan agreement with Gibbs, he had no expectation of receiving any money until October 2007. Therefore, in his view, there was no need for further contact in the interim.

At the conclusion of the evidence, the United States urged the Court to deny Farnsworth's claim on the grounds that the evidence demonstrated by a preponderance that his "investment" was actually an illegal structured currency transaction. The government argued that the unequivocal import of the instructions given by Farnsworth to Gibbs on August 14, 2006, was to unobtrusively place the $565,000 in bundled currency into the stream of commerce, in a fashion that raised "no red flags." The government also suggested that the Court could reasonably infer from the unorthodox handling of the currency that it was derived from or constituted unreported income. Farnsworth countered that his beliefs and practices may be unconventional, but they do not constitute the type of inequitable conduct that would warrant denial of his claim.

In crafting an order of restitution under 18 U.S.C. § 3664(e), the Court is tasked to employ its inherent equitable powers to assess, and if possible requite, victims for their losses. *S.E.C. v. Forex Asset Mgmt.*, 242 F.3d 325, 332 (5th Cir. 2001); *United States v. Long*, 537 F.2d 1151, 1153 (4th Cir. 1975). Although guiding precedent is sparse, it is clear that in invoking equitable powers, the Court may deny a claim if its proponent has engaged in inequitable conduct, either in the prosecution of their claim, or their involvement in the underlying fraudulent transaction. *See United States v. Cabe*, 311 F.

5

Supp. 2d 501, 506 (D.S.C. 2003); *United States v. Martinez*, 978 F. Supp. 1442, 1452–53

(D.N.M. 1997).

After thoroughly reviewing the evidence adduced by both sides in this case, the

Court is of the opinion that the United States has proved by a preponderance of the

evidence that Farnsworth's investment in Gibbs' currency trading scheme was in essence

an illicit currency structuring transaction akin to money laundering. Admittedly, the

evidence is unclear as to whether the currency had an illicit source, or as suggested by the

government, was being sheltered from the Internal Revenue Service. Such a finding is

unnecessary since Farnsworth's investment itself had all the earmarks of an illegal

currency transaction. Moreover, when measured against the standard of reason, common

sense, and human experience, Farnsworth's explanation strains credibility.

In the final analysis, the Court must conclude, based on the evidence at hand, that

Farnsworth has unclean hands and is therefore not entitled to seek the equitable remedy of

restitution from this Court. *See Age of Majority Educ. Corp. v. Preller*, 512 F.2d 1241,

1245 (4th Cir. 1975). Therefore, his claim is denied.

/s/
Henry E. Hudson
United States District Court

Date: Sept 25, 2008
Richmond, Virginia

6